66 F.3d 621
 UPS WORLDWIDE FORWARDING, INC.
v.
UNITED STATES POSTAL SERVICE, Appellant.
Air Courier Conference of America/International Committee
(Intervenor in District Court).
 No. 94-7423.
 United States Court of Appeals,
Third Circuit.
 Argued March 10, 1995.
Decided Sept. 15, 1995.
 
 Jonathan R. Siegel (argued), Douglas N. Letter, United States Department of Justice, Civil Division, Appellate Staff, Washington, DC, for appellant, United States Postal Service.
 John E. McKeever (argued), Robert L. Kendall, Jr., Karen L. Tomlinson, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for appellee, UPS Worldwide Forwarding, Inc.
 L. Peter Farkas, Graham & James, Washington, DC, for appellee, Air Courier Conference of America/International Committee.
 Before: BECKER, SCIRICA, and WOOD, Jr.* , Circuit Judges.
 OPINION OF THE COURT
 SCIRICA, Circuit Judge.
 
 
 1
 In this case, UPS Worldwide Forwarding seeks to prevent the United States Postal Service from implementing a new service for customers that ship significant quantities of international mail. In response, the Postal Service attacks UPS's standing to bring suit. The district court determined that UPS had standing but that the Postal Service exceeded its authority in promulgating the new program. We will reverse.
 
 I.
 
 2
 In July 1992, the Postal Service announced the creation, on an interim basis, of an International Customized Mail ("ICM") service. See 57 Fed.Reg. 30651 (1992). Despite protests from UPS, a large delivery company that competes with the Postal Service, the Postal Service adopted the ICM program on a permanent basis in May 1993. See 58 Fed.Reg. 29778 (1993).
 
 
 3
 Under the ICM service, qualifying international mailers negotiate individualized service agreements with the Postal Service to establish the kind of services to be provided and the rate of postage. To qualify for the service, international mailers must be capable, on an annual basis, of mailing at least one million pounds of international mail or paying at least two million dollars in international postage. Id.
 
 
 4
 Two months after publication of the permanent regulation, UPS filed suit in the District of Delaware, alleging the ICM service violated several provisions of the Postal Reorganization Act ("PRA"), Pub.L. No. 91-375, 84 Stat. 719 (1970) (codified at 39 U.S.C. Secs. 101-5605). The Postal Service disagreed, claiming that its promulgation of the ICM regulation did not exceed its statutory authority. The Postal Service also contended that UPS lacked standing to file the action. Air Courier Conference of America/International Committee ("ACCA"), an unincorporated association of firms engaged in letter and parcel delivery services, then filed a motion to intervene.
 
 
 5
 Subsequently, the district court granted UPS's motion for summary judgment. UPS Worldwide Forwarding, Inc. v. United States Postal Serv., 853 F.Supp. 800 (D.Del.1994). First, the court held that UPS had standing to challenge the Postal Service program. Id. at 804. Second, the court found the ICM service violated several sections of the PRA, codified at 39 U.S.C. Secs. 101(d),[1] 403(b)-(c),[2] and 407(a)[3] (1988), and issued an injunction barring the Postal Service from operating the program. Id. at 804-07. Finally, the court granted ACCA's motion to intervene. Id. at 806-07. The Postal Service appealed.
 
 
 6
 The district court had jurisdiction under 28 U.S.C. Secs. 1331 and 1339 (1988) and 39 U.S.C. Sec. 409(a) (1988). We have jurisdiction under 28 U.S.C. Sec. 1291 (1988). Our review of these issues of standing and statutory construction is plenary. See Polychrome Int'l Corp. v. Krigger, 5 F.3d 1522, 1530 n. 19 (3d Cir.1993) ("We have plenary review of the district court's judgment on standing."); Resolution Trust Corp. v. Cityfed Fin. Corp., 57 F.3d 1231, 1237 (3d Cir.1995) ("Our review of the construction of federal statutes is plenary.").
 
 II.
 
 7
 Before addressing standing and the merits, we consider the history of the statutory sections and regulations at the core of this dispute. This review takes us back more than two hundred years.
 
 
 8
 In 1789, the First Congress established a Post Office and provided for the appointment of a Postmaster General. See Act of Sept. 22, 1789, ch. 16, 1 Stat. 70; National Ass'n of Greeting Card Publishers v. United States Postal Serv., 462 U.S. 810, 813, 103 S.Ct. 2717, 2721, 77 L.Ed.2d 195 (1983). Three years later, Congress approved a statute that "established basic mail rates, granted the Post Office Department a monopoly on mail delivery and authorized the creation of post roads." See Joseph W. Belluck, Increasing Citizen Participation in U.S. Postal Service Policy Making, 42 Buff.L.Rev. 253, 257 (1994); see also Act of Feb. 20, 1792, ch. 7, 1 Stat. 232. Under this Act, Congress set the rates not only for domestic mail, but also for letters and parcels sent abroad. Id. Sec. 26, 1 Stat. at 239.
 
 
 9
 In 1825 and 1827, Congress passed laws prohibiting the private carriage of letters via stage, boat, horseback, or on foot, thereby "target[ing] transportation of mail which even then was contracted out to private carriers." Air Courier Conference of America v. American Postal Workers Union, 498 U.S. 517, 526, 111 S.Ct. 913, 919, 112 L.Ed.2d 1125 (1991). In the 1825 statute, Congress once again set the rate for domestic and international mail. See Act of Mar. 3, 1825, ch. 64, Secs. 13, 34, 4 Stat. 102, 105, 112.
 
 
 10
 Despite the prohibitions on private carriers of mail, "high postal rates enabled private expresses to make substantial inroads into the domestic market for delivery of letters and the 1825 and 1827 Acts proved unsuccessful in prosecuting them." Air Courier Conference, 498 U.S. at 526, 111 S.Ct. at 919. In response, Congress passed a series of laws between 1845 and 1851 reducing postage rates. Belluck, supra, at 258. Congress believed the 1845 Act, which strengthened the postal monopoly and reduced rates, "would have the dual virtues of driving private expresses out of business and increasing mail volume of the Post Office." Air Courier Conference, 498 U.S. at 527, 111 S.Ct. at 919 (citing Act of Mar. 3, 1845, 5 Stat. 732). The 1851 Act continued the trend of reducing rates, but for the first time permitted those international rates set by Congress to be changed via "postal treaty or convention already concluded or hereafter to be made." See Act. of Mar. 3, 1851, ch. 20, Sec. 1, 9 Stat. 587, 588. The Act also provided:
 
 
 11
 [T]he Postmaster General, by and with the advice and consent of the President of the United States, shall be, and he hereby is, authorized to reduce or enlarge, from time to time, the rates of postage upon all letters and other mailable matter conveyed between the United States and any foreign country, for the purpose of making better postal arrangements with other governments, or counteracting any adverse measures affecting our postal intercourse with foreign countries....
 
 
 12
 Id. Sec. 2, 9 Stat. at 589. In 1872, Congress combined into one statutory section the authority of the Postmaster General to negotiate postal treaties and change international rates. See Act of June 8, 1872, ch. 335, Sec. 167, 17 Stat. 283, 304 ("[T]he Postmaster General, by and with the advice and consent of the President, may negotiate and conclude postal treaties or conventions, and may reduce or increase the rates of postage on mail matter conveyed between the United States and foreign countries.").
 
 
 13
 Although technology advanced rapidly over the next century, the organization of postal services remained largely unchanged. Congress continued to set domestic mail rates, see 39 U.S.C. chs. 51-69 (1964), and the Postmaster General retained the authority to change international rates, with the advice and consent of the President. Id. Sec. 505. Congress also maintained the Post Office monopoly over mail delivery in an effort to keep revenues high and mailing costs low. Air Courier Conference, 498 U.S. at 527-28, 111 S.Ct. at 919-20.
 
 
 14
 By 1970, however, the Post Office "faced a major financial crisis" that resulted in significant backlogs of mail and postal worker strikes. Belluck, supra, at 262, 265. Congress responded by passing the Postal Reorganization Act, an overhaul of the entire postal system that represented "a dramatic break with the past." See Mail Order Ass'n of America v. United States Postal Serv., 986 F.2d 509, 512 (D.C.Cir.1993); see also H.R. No. 1104, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.C.C.A.N. 3649, 3651-52.
 
 
 15
 The PRA "abolished the Post Office Department, which since 1789 had administered the Nation's mails," and replaced it with the United States Postal Service, an independent agency within the executive branch. National Ass'n of Greeting Card Publishers, 462 U.S. at 813, 103 S.Ct. at 2721. The Act divested Congress of control over postal rates, id., with domestic rates set through a complex process involving the Postal Service, Postal Rate Commission, and Governors of the Postal Service, and international rates set by "[t]he Postal Service, with the consent of the President." Air Courier Conference of America v. United States Postal Serv., 959 F.2d 1213, 1216-23 (3d Cir.1992) (quoting 39 U.S.C. Sec. 407(a)). Congress also ordered the Postal Service to become self-sustaining, generating enough revenue to cover its expenses, thereby "launching 'the Postal Service into the commercial world.' " Loeffler v. Frank, 486 U.S. 549, 556, 108 S.Ct. 1965, 1970, 100 L.Ed.2d 549 (1988) (quoting Franchise Tax Bd. of California v. United States Postal Serv., 467 U.S. 512, 520, 104 S.Ct. 2549, 2554, 81 L.Ed.2d 446 (1984)); see also H.R. No. 1104, 91st Cong., 2d Sess., reprinted in 1970 U.S.C.C.A.N. at 3665. At the same time, the Act generally required fairness and forbade undue discrimination or preferences in the establishment of postal rates and services. See 39 U.S.C. Secs. 101(d), 403(c).
 
 
 16
 The PRA continued the Postal Service's statutory monopoly "over the carriage of letters in and from the United States," see Air Courier Conference, 498 U.S. at 519, 111 S.Ct. at 915. (citing 18 U.S.C. Secs. 1693-1699 and 39 U.S.C. Secs. 601-606), but it permitted the Postal Service to suspend its monopoly "where the public interest requires." Id. (citing 39 U.S.C. Sec. 601(b)). In 1979, the Postal Service suspended its monopoly over "extremely urgent letters" sent within the United States and abroad, thus allowing private couriers such as UPS to compete with it in the overnight delivery of letters. See id. (citing 39 C.F.R. Sec. 320.6). In 1986, it went further by generally suspending its monopoly over mail sent abroad. See id. at 519-20, 111 S.Ct. at 915-16; see also 39 C.F.R. Sec. 320.8.[4]
 
 III.
 
 17
 Article III of the Constitution restricts the "judicial power" of the United States to the resolution of "cases" and "controversies." See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 471, 102 S.Ct. 752, 757-58, 70 L.Ed.2d 700 (1982). Subsumed within this restriction is the requirement that "a litigant have 'standing' to challenge the action sought to be adjudicated in the lawsuit." Id. U.S.C.A. Const. Art. 3, Sec. 1 et seq. Standing has constitutional and prudential components, both of which must be satisfied before a litigant may seek redress in the federal courts. Id.; Wheeler v. Travelers Ins. Co., 22 F.3d 534, 537 (3d Cir.1994).
 
 A.
 
 18
 Earlier this year, the Supreme Court reiterated the three elements necessary to satisfy "the irreducible constitutional minimum of standing":First, the plaintiff must have suffered an 'injury in fact'--an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.
 
 
 19
 United States v. Hays, --- U.S. ----, ----, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)).
 
 
 20
 In this case, there is no dispute that UPS meets the constitutional standing requirements. First, as a competitor of the Postal Service with authority to compete in the international parcel delivery market,[5] UPS stands to lose clientele lured to the Postal Service by the ICM service. Although UPS may not have demonstrated any lost business yet, the "injury in fact" component of standing merely requires that such injury be "imminent." Id.; see also Schering Corp. v. FDA, 51 F.3d 390, 395 (3d Cir.1995) (noting that "threatened injury" suffices for Article III standing). Second, the requisite "causal connection" between UPS's injuries and the Postal Service's conduct is clear; in fact, the Postal Service created the ICM program with the express purpose of "attract[ing] customers that currently use its competitors and [that] would not otherwise use the Postal Service for their international mailings. If the Postal Service is successful, the additional volume will come from competitors, not from the Postal Service's other international services." 58 Fed.Reg. 29778, 29780. Finally, a decision favorable to UPS will undoubtedly redress its injuries. If we uphold the district court's decision for UPS, the Postal Service will not be able to implement the ICM service, and UPS cannot lose customers to a program that does not exist.
 
 B.
 
 21
 In addition to the Article III standing requirements, federal courts have developed prudential standing considerations "that are part of judicial self-government." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). These prudential standing rules require that:
 
 
 22
 (1) a litigant "assert his [or her] own legal interests rather than those of third parties," (2) courts "refrain from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' " and (3) a litigant demonstrate that her interests are arguably within "the zone of interests" intended to be protected by the statute, rule or constitutional provision on which the claim is based.
 
 
 23
 Wheeler v. Travelers Ins. Co., 22 F.3d 534, 538 (3d Cir.1994) (citations omitted); see also Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 474-75, 102 S.Ct. 752, 759-60, 70 L.Ed.2d 700 (1982).[6]1.
 
 
 24
 The first step in satisfying prudential standing is for the litigant to demonstrate that it has asserted its "own legal interests rather than those of third parties." Wheeler, 22 F.3d at 538; see also Valley Forge, 454 U.S. at 474, 102 S.Ct. at 759-60; Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The Postal Service alleges that UPS does not meet this first requirement because it has sued under provisions of the PRA that purportedly exist to protect users of the mail, not competitors: "Because plaintiff does not claim to be injured as a mailer, it may not challenge alleged violations of statutory provisions that protect mailers from undue discrimination." Appellant's Brf. at 14.
 
 
 25
 We believe the Postal Service confuses this first element of prudential standing, that plaintiff assert its own rights, with the third element, that plaintiff's complaint be within the "zone of interests" the statute was designed to protect or regulate. See, e.g., Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding & Dry Dock Co., --- U.S. ----, ----, 115 S.Ct. 1278, 1283, 131 L.Ed.2d 160 (1995). Under the zone of interests test, a plaintiff must demonstrate the "interest he seeks to vindicate is arguably within the 'zone of interests to be protected or regulated by the statute' in question." See id. (citations omitted); see also infra part III.B.3. The first element only mandates that litigants assert their own legal rights, not those of others. Wheeler, 22 F.3d at 538. This test generally comes into play in those cases in which a party seeks to challenge agency action that affects another party. See, e.g., id. at 539 (holding that plaintiff "fails to satisfy the prudential requirements for standing because she improperly is seeking to vindicate the rights of a third-party, the United States").
 
 
 26
 In this case, as we have noted, the Postal Service has granted UPS and other delivery companies the right to compete in the delivery of international mail. See 39 C.F.R. Secs. 320.6, 320.8 (1994); see also supra part II. If the ICM service is permitted, UPS alleges it would be injured in the exercise of its right to deliver such mail, a point the Postal Service has not contested on appeal. Therefore, we believe UPS is properly asserting its "own legal interests." Wheeler, 22 F.3d at 538.
 
 2.
 
 27
 The second prudential standing consideration admonishes courts to "refrain from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances.' " Id. For example, the Supreme Court has denied standing, inter alia, in cases in which plaintiffs sued to protest the Vietnam War, see Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 220, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974) ("[S]tanding to sue may not be predicated upon an interest of the kind alleged here which is held in common by all members of the public...."); or to challenge the legality of the Central Intelligence Agency, see United States v. Richardson, 418 U.S. 166, 175, 94 S.Ct. 2940, 2945, 41 L.Ed.2d 678 (1974) (citation omitted) (rejecting plaintiff's attempt to "employ a federal court as a forum in which to air his generalized grievances about the conduct of government"). We hold that this dispute is not the type of "generalized grievance" that poses a barrier to standing.
 
 3.
 
 28
 Finally, litigants must demonstrate their interests fall "arguably within the 'zone of interests to be protected or regulated by the statute' in question." See Newport News Shipbuilding, --- U.S. at ----, 115 S.Ct. at 1283 (citations omitted); see also Wheeler, 22 F.3d at 538. This element represents the primary focus of the parties' dispute over standing.
 
 
 29
 In Association of Data Processing Service Organizations, Inc. v. Camp., 397 U.S. 150, 153, 90 S.Ct. 827, 829-30, 25 L.Ed.2d 184 (1970), the Supreme Court formulated the "zone of interests" element of standing. In Data Processing, sellers of data processing services challenged a Comptroller of the Currency ruling that permitted national banks to offer data processing services to their customers. Plaintiffs contested the ruling as contrary to a statute barring bank service corporations from engaging in "any activity other than the performance of bank services for banks." Id. at 155, 90 S.Ct. at 831 (citation omitted). The Supreme Court found plaintiffs had standing because their interests were within the "zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Id. at 153, 90 S.Ct. at 830.[7] Similarly, in Clarke v. Securities Industry Ass'n, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), the Court held a trade association of securities brokers had standing to challenge a decision by the Comptroller that national banks could operate discount brokerage services in locations outside of their home states. Id. at 394-403, 107 S.Ct. at 754-759. The Comptroller claimed the trade association did not have standing because it was not within the "zone of interests" of the McFadden Act, which limited national banks to conducting general business in their home states. But the Court held it was essential to consider the "zone of interests" of both the McFadden Act and the National Bank Act, which the McFadden Act had amended. The Court stated, "As Data Processing demonstrates, we are not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress' overall purposes in the National Bank Act." Id. at 401, 107 S.Ct. at 758. Furthermore, as in prior cases, the Court held that "competitors who allege an injury that implicates the policies of the National Bank Act are very reasonable candidates to seek review of the Comptroller's rulings." Id. at 403, 107 S.Ct. at 759.
 
 
 30
 Although Clarke noted the zone of interests "test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff," id. at 399-400, 107 S.Ct. at 757 (footnote omitted), recent Supreme Court jurisprudence suggests a somewhat stricter test. See, e.g., Chem Serv., Inc. v. Environmental Monitoring Sys. Lab., 12 F.3d 1256, 1262 (3d Cir.1993) ("Most recently, the Court has taken a stricter view of what statute or statutes should be considered as 'relevant' for the purpose of applying the zone of interest test."). The prominent example of this stricter approach is Air Courier Conference of America v. American Postal Workers Union, 498 U.S. 517, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991).
 
 
 31
 In Air Courier Conference, unions representing postal workers challenged a Postal Service regulation that suspended the postal monopoly to permit "international remailing," the practice of "bypassing the Postal Service and using private courier systems to deposit with foreign postal systems letters destined for foreign addresses." Id. at 520, 111 S.Ct. at 915-916. The Court of Appeals for the District of Columbia Circuit had found standing because the PRA, the statute also at issue in this case, provided protections for workers while recodifying the Private Express Statutes ("PES"), which governed the postal monopoly over mail delivery. Thus, the D.C. Circuit concluded, the employees' interests were within the "zone of interests" of the PRA. Id. at 521-22, 111 S.Ct. at 916-17.
 
 
 32
 The Supreme Court reversed, holding that the Court of Appeals had erred in looking at the entire PRA in applying the "zone of interests" test. The Court stated:
 
 
 33
 The only relationship between the PES, upon which the Unions rely for their claim on the merits, and the labor-management provisions of the PRA, upon which the Unions rely for their standing, is that both were included in the general codification of postal statutes embraced in the PRA. The statutory provisions enacted and reenacted in the PRA are spread over some 65 pages in the United States Code and take up an entire title of that volume. We said in Lujan that "the relevant statute [under the APA] of course, is the statute whose violation is the gravamen of the complaint." To adopt the unions' contention would require us to hold that the "relevant statute" in this case is the PRA, with all of its various provisions united only by the fact that they deal with the Postal Service. But to accept this level of generality in defining the "relevant statute" could deprive the zone-of-interests test of virtually all meaning.
 
 
 34
 Unlike the two sections of the National Bank Act discussed in Clarke, supra, none of the provisions of the PES have any integral relationship with the labor-management provisions of the PRA.
 
 
 35
 Id. at 529-30, 111 S.Ct. at 921 (quoting Lujan v. National Wildlife Fed'n, 497 U.S. 871, 886, 110 S.Ct. 3177, 3187-88, 111 L.Ed.2d 695 (1990) (citation omitted)). Accordingly, the Supreme Court held the unions lacked standing to bring their claim.[8]
 
 
 36
 The Postal Service contends that Air Courier Conference dictates that UPS be denied standing in this case.[9] It alleges the purposes behind the PRA sections involved here, 39 U.S.C. Secs. 101(d), 403(b)-(c), and 407(a),[10] were not to protect competitors of the Postal Service. Instead, the Postal Service claims that Secs. 101(d) and 403(b)-(c), which generally require fairness in establishing postal rates, were intended to protect mailers. Furthermore, the Postal Service argues that Sec. 407(a) was meant to protect the president's foreign policy authority, not the interests of private Postal Service competitors. Thus, the Postal Service asserts, UPS should be denied standing here.
 
 
 37
 We believe the Postal Service misconstrues the lessons of Air Courier Conference and its predecessors. These cases do not require that plaintiffs be among the intended beneficiaries of the statute under which they are suing. See, e.g., Clarke, 479 U.S. at 399-400, 107 S.Ct. at 757 (requiring "no indication of congressional purpose to benefit the would-be plaintiff"); Schering Corp. v. FDA, 51 F.3d 390, 395 (3d Cir.1995) ("The [zone of interests] test, however, is not so stringent that it requires the would-be plaintiff to be specifically targeted by Congress as a beneficiary of the statute."). Even Air Courier Conference merely required an "integral relationship" between the statutory provisions plaintiffs claim have been violated and the provisions under which plaintiffs claim standing. Air Courier Conference, 498 U.S. at 530, 111 S.Ct. at 921 (noting that "none of the provisions of the PES have any integral relationship with the labor-management provisions of the PRA");[11] see also Chem Serv., Inc., 12 F.3d at 1264-65 (upholding standing where statutes found to have an "integral relationship" with each other (quoting Air Courier Conference, 498 U.S. at 530, 111 S.Ct. at 921)).
 
 
 38
 In this case, we believe an "integral relationship" exists among the relevant statutory provisions. Sections 101(d), 403(b)-(c), and 407(a) provide procedures for the manner in which postal rates may be adopted and the types of rates that will and will not be permitted. As we noted supra in part II, the history of the Postal Service demonstrates that Congress understood that statutes setting postal rates were inextricably linked with those governing the postal monopoly. See Air Courier Conference, 498 U.S. at 526-27, 111 S.Ct. at 919-20 (citing Act of Mar. 3, 1845, 5 Stat. 732). Both types of statutes were intended to affect competitors. See id.
 
 
 39
 In fact, in Air Courier Conference, the Supreme Court recognized that competitors fall within the zone of interests of the postal monopoly statutes. See id. at 528 n. 5, 111 S.Ct. at 920 n. 5 ("The PES are competition statutes that regulate the conduct of competitors of the Postal Service. The postal employees for whose benefit the Unions have brought suit here are not competitors of either the Postal Service or remailers."). Although the Supreme Court noted that "[e]mployees have generally been denied standing to enforce competition laws because they lack competitive and direct injury," id., it reiterated that "competitors of regulated entities have standing to challenge regulations." Id. at 529, 111 S.Ct. at 920. In this case, it is undisputed that UPS is a competitor of the Postal Service. Because the regulation at issue involves Postal Service rate-making--a fundamental means of affecting competition, as we noted supra in part II--UPS has standing to challenge it. Such standing is all the more clear in cases, like this one, where the agency that is promulgating the regulation is also the "competitor" whose interests are being advanced.
 
 
 40
 These statutes, governing the postal monopoly and postal rate-making, are on a different footing than the labor-management provisions under which plaintiffs claimed standing in Air Courier Conference. Those labor provisions were a new feature of the 1970 Act, unrelated to the postal monopoly provisions that had existed for more than a century. See Air Courier Conference, 498 U.S. at 524-28, 111 S.Ct. at 918-20. But as we have noted, the relationship between the postal monopoly and rate-making rules--and their effect on competitors--has existed for most of the two-hundred year history of the postal statutes. See supra part II.
 
 
 41
 Furthermore, while the Supreme Court has recognized competitors have an interest in enforcing the postal monopoly statutes, Congress has provided that competitors are within the "zone of interests" of the postal rate-making statutes. The PRA expressly requires that the Postal Rate Commission, in recommending rates, consider the effect of increases on, inter alia, "enterprises in the private sector of the economy engaged in the delivery of mail matter other than letters." 39 U.S.C. Sec. 3622(b)(4). The same section also requires the Commission to consider the "policies of this title," thereby incorporating the statements of "[p]ostal policy" of Sec. 101, which is one of the provisions under which UPS has filed suit. Thus, we believe competitors such as UPS fall within the "zone of interests" of these rate-making statutes.
 
 
 42
 In fact, we believe the Postal Service has largely conceded the issue. In its brief, the Postal Service admitted that competitors would have standing to sue under Secs. 101 and 403 if they alleged that the rates set were a "predatory attempt to destroy competition." See Appellant's Brf. at 16. In conceding standing in this context, the Postal Service necessarily admits that protecting competitors from economic injury caused by illegal regulations falls within the zone of interests of these statutory provisions. We fail to see why competitors would be within the zone of interests if Secs. 101 and 403 were violated by the Postal Service's predatory rate pricing but not if the same provisions were violated by the Postal Service's establishment of unfair or inequitable rates.
 
 
 43
 In evaluating the PRA's rate-making provisions, it appears that Congress was concerned with balancing certain societal interests: those of government, various categories of mailers, and private competitors. Recently we faced a similar situation in Schering Corp. v. FDA, 51 F.3d 390 (3d Cir.1995), in which a drug manufacturer challenged the FDA's approval of a regulation that permitted its competitors, manufacturers of generic drugs, to use an abbreviated application procedure. In affirming the drug manufacturer's standing, we recognized the relevant Act "reflect[ed] a statutory compromise of the competing concerns" of the public and of various drug manufacturers. Id. at 396 (citation omitted). Similarly, we view the sections of the PRA governing postal rates as striking a balance between competing concerns. Although we understand a fundamental purpose of the PRA was to make the Postal Service more competitive, we note that Congress also expressed some concern for private competitors of the Postal Service. See, e.g., 39 U.S.C. Sec. 3622(b)(4). Accordingly, we hold that UPS falls within the "zone of interests" of these statutory provisions generally governing postal rates.[12]
 
 IV.
 
 44
 Turning to the merits, we address the district court's holding that the Postal Service's promulgation of the regulation establishing the ICM service violated several provisions of the PRA. See UPS Worldwide Forwarding, Inc. v. United States Postal Serv., 853 F.Supp. 800, 804-06 (D.Del.1994). To understand these provisions, it is necessary to consider the framework of the rate-making sections of the PRA and how the ICM service fits within this statutory scheme.
 
 A.
 
 45
 As we have noted, a fundamental change wrought by the PRA was to transfer rate-making authority from Congress to the Postal Service and related agencies. See supra part II. For domestic rates, the PRA established a complex process whereby the Postal Service proposes rates, the Postal Rate Commission considers the proposals and offers its recommendations, and the Governors of the Postal Service act on the recommendations. See Air Courier Conference of America v. United States Postal Serv., 959 F.2d 1213, 1216 (3d Cir.1992) (citing various provisions of the PRA). In making its recommendations, the Commission is instructed to consider numerous factors listed in the PRA, 39 U.S.C. Sec. 3622(b), and it must conduct a hearing to allow the Postal Service and public to testify. Id. Sec. 3624. For certain types of mail, such as the different classes of mail for letters, the Postal Service must establish a rate that is "uniform throughout the United States, its territories, and possessions." Id. Sec. 3623(d); see also id. Sec. 3683 (prescribing "[u]niform rates for books; films; other materials").
 
 
 46
 In contrast to the domestic rate-making procedure, the PRA's international rate-making rules are a model of simplicity. The PRA provides:
 
 
 47
 The Postal Service, with the consent of the President, may negotiate and conclude postal treaties or conventions, and may establish the rates of postage or other charges on mail matter conveyed between the United States and other countries.
 
 
 48
 39 U.S.C. Sec. 407(a). No proposals need be made and considered by other bodies, no public hearings held, and no specific criteria considered. Instead, the Postal Service need only "establish" international rates, with the President's consent. We believe the differences between the domestic and international rate-making procedures demonstrate that Congress intended the Postal Service to have significant authority and flexibility in establishing the rates for mail sent abroad.
 
 B.
 
 49
 Pursuant to the PRA statutory scheme, the Postal Service promulgated the ICM service for international mailers. See 58 Fed.Reg. 29778 (1993). In publishing its interim regulation, the Postal Service offered two primary reasons for the ICM service. First, it explained that other countries have adopted varying charges on mail sent from the United States, with some based on weight and others on volume. A uniform price for overseas mail, particularly for large-volume customers, meant that "some customers face[d] published rates disproportionate to the costs that the Postal Service would incur in providing those customers with the services in question...." 57 Fed.Reg. 30651, 30652 (1992). The Postal Service explained:
 
 
 50
 Until relatively recently, the most significant components of the costs incurred by the Postal Service in connection with its international operations, namely transportation expenses and the charges imposed by foreign postal administrations to deliver U.S.-origin mail (terminal dues), were based exclusively on weight. Although transportation expenses are still a function of weight, the postal administrations of countries to which much U.S. mail is sent have implemented terminal dues arrangements that recognize that mail processing costs vary by volume as well as by weight. Moreover, the Postal Service currently is charged terminal dues by foreign postal administrations using four different methods of calculation. Consequently, the Postal Service incurs substantially different costs for delivering mail to different countries. Due to uniform pricing, however, the Postal Service's rates do not reflect country-specific costs to the extent possible. Similarly, uniform rates do not generally take into account differences in how mail is prepared or where it is tendered, both of which can significantly affect costs.
 
 
 51
 Id. (footnote omitted).
 
 
 52
 Second, because of the regulation permitting private couriers to deliver international mail, the Postal Service faced increasing competition from companies attempting to lure mailers by "implementing flexible rate structures and customer-specific service offerings." Id. The Postal Service noted:
 
 
 53
 This flexibility enables the Postal Service's competitors to tailor service features to individual customers and to price those features on a partially or completely disaggregated basis. In contrast, traditional Postal Service pricing policies and practices, whereby the Postal Service generally treats all current and potential customers identically and uses averaged costs when setting rates, are not designed to deal with a competitive environment. The expanded alternatives available to customers and the improved attractiveness of those alternatives have made it increasingly difficult for the Postal Service to sell its services to a varied group of customers using a single published schedule of rates. To the extent that uniform pricing prevents the Postal Service from attracting new customers and keeping existing customers, all of the Postal Service's other users suffer by having to pay more for their postal services.
 
 
 54
 Id.
 
 
 55
 Despite its reasons for implementing the program, the Postal Service determined that it would not be feasible to offer ICM service to everyone "regardless of size or mailing patterns." Id. at 30653. The Postal Service estimated substantial costs to negotiate and implement the ICM agreements; expenses were high enough so that "for all but the largest volume customers, those costs in many instances could be greater" than the Postal Service earned from the ICM program. Id. Furthermore, the Postal Service expected to benefit from economies of scale generated by large-volume customers that would not occur with smaller mailers. As it noted, "[I]ncreased volumes amplify the beneficial effects of flexible pricing." Id. Because ICM agreements vary depending upon the level of services required by individual customers, ICM rates may be higher, lower, or the same as ordinary public rates.
 
 C.
 
 56
 Despite the flexibility accorded the Postal Service in the international arena, see supra part IV.A, the PRA contains several general statements of policy, duties, and powers--such as prohibitions on discrimination and requirements of fairness--that serve as additional limitations on both domestic and international rates. See 57 Fed.Reg. 30651, 30652 (1992) (listing, inter alia, Secs. 101(d) and 403(c) as restricting rates). It is these general statutory statements of "policy" and "duties" on which UPS relies in attacking the ICM program. We will consider each of these sections in turn.
 
 1.
 
 57
 Section 101 opens the PRA, outlining general statements of "Postal policy." Subsection (d) provides: "Postal rates shall be established to apportion the costs of all postal operations to all users of the mail on a fair and equitable basis." A similar general requirement is contained in Sec. 403(c), which lists the "[g]eneral duties" of the Postal Service:
 
 
 58
 In providing services and in establishing classifications, rates, and fees under this title, the Postal Service shall not, except as specifically authorized in this title, make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user.
 
 
 59
 The district court found the ICM service violated these provisions because, to qualify for the program, customers must be capable of mailing one million pounds of international mail or paying two million dollars in international postage per year, but they need not actually mail or pay any specified amounts. See 58 Fed.Reg. 29778. The district court stated:
 
 
 60
 Under the ICM system, small-volume mailers who are not able to meet the threshold capacity requirements of the ICM agreements are not able to gain the benefit of an individually negotiated, lower rate. The costs are not apportioned fairly, because under the ICM, there is no requirement that the large-volume mailer actually deliver more than the small-volume mailer.
 
 
 61
 UPS Worldwide Forwarding, 853 F.Supp. at 805. The court found this set of circumstances discriminated unreasonably against small-volume mailers. Id. In so holding, the court stated that "[s]eemingly, there is no reasonable explanation as to why the Postal Service uses capability as a criteria rather than actual performance." Id. We disagree.
 
 
 62
 We believe the Postal Service has offered a reasonable explanation for its business decision to require that mailers be "capable" of tendering a certain threshold amount of mail, rather than mandating that potential customers agree up front to actually tender that minimum. As counsel explained at oral argument:
 
 
 63
 To require a commitment would just sort of drive [potential customers] off. I mean, if you say we are not giving you this business until you commit to it, then you never get the business.
 
 
 64
 It is better to make them the offer, get them to try the business, and then in practice my client informs me, once you get the business of a big company, you tend to get all its business.
 
 
 65
 Tr. at 44-45. We believe this provides a logical and reasonable explanation for the Postal Service's business decision. UPS does not contend the Postal Service's explanation fails to pass muster in an economic sense; it merely argues the Postal Service does not have the authority to make such business judgments. But Congress repeatedly indicated that a primary purpose underlying the PRA was to require the Postal Service to discard its system of political patronage and bureaucratic decision-making in favor of modern business practices. See infra part IV.D. We see nothing in the PRA that prevents the Postal Service from innovative attempts to increase its business and profits, as long as it stays within the bounds of the relevant statutes.
 
 
 66
 As we have noted, Sec. 101(d) provides that "[p]ostal rates shall be established to apportion the costs of all postal operations to all users of the mail on a fair and equitable basis." The determination whether a particular rate is "fair" or "equitable" is not capable of precise definition, but we do not view the ICM service as unfair or inequitable. The program may benefit large-volume mailers over their smaller counterparts because of economies of scale. That the Postal Service chose to offer the program to those "capable" of tendering a certain minimum level of mail or dollars, instead of those that actually so deliver, reflects a reasonable business decision about the most effective means to solicit new customers.
 
 
 67
 Similarly, we do not view the ICM service as violative of Sec. 403(c)'s ban on "undue or unreasonable discrimination" or "undue or unreasonable preferences." We cannot ignore that the "undue or unreasonable" language, twice repeated in Sec. 403(c), means that reasonable discrimination and preferences among users of the mail are permitted. Allowing a limited class--the relatively small percentage of large-volume mailers eligible to participate in the ICM program--to negotiate individual service plans at individual rates does not appear on its face to be "undue or unreasonable." As we have noted, it permits the Postal Service to compete more effectively for the business of large-volume mailers, see supra part IV.B, fulfilling congressional intent. See infra part IV.D.[13]
 
 
 68
 As with the terms "fair" and "equitable" in Sec. 101(d), we find it difficult to define the contours of what constitutes "undue or unreasonable" discrimination or preferences. We note that other courts, when confronting this section, have accorded postal authorities broad latitude. In Mail Order Ass'n of America v. United States Postal Service, 2 F.3d 408, 434 (D.C.Cir.1993), magazine publishers challenged the Postal Rate Commission's decision not to adopt a "zoned" second-class mail rate, i.e., a rate that would increase with distance. Because the Commission's decision had not violated any specific rate provision of the PRA, the Court of Appeals for the District of Columbia reasoned that:The question, then, is whether the Commission was arbitrary in its ultimate trade-off between the cost considerations that pointed toward zoning, and the competing values that it ultimately favored. Any such arbitrariness would presumably violate 39 U.S.C. Sec. 403(c)'s prohibition of "undue or unreasonable preferences."
 
 
 69
 Id. at 435-36. The court noted that "[t]he refusal to zone indeed appears unsupported by any cost principle." Id. at 436. Nevertheless, the court ultimately held that, because the Commission had valid reasons for its decision, it had not violated Sec. 403(c). Id. at 437.[14] Similarly, as we noted supra in part IV.B., the Postal Service had equally valid reasons for its decision to create the ICM service.
 
 
 70
 On its face, then, we believe the ICM service does not violate Sec. 403(c). The regulation promulgating the ICM program requires the Postal Service to "make every ICM service agreement available to similarly situated customers under substantially similar circumstances and conditions." See 58 Fed.Reg. 29782. To facilitate that process, the regulation mandates that the Postal Service publish detailed information about each ICM agreement, including the term, rate, type of mail involved, destination country or countries, minimum volume commitments, and descriptions of services to be provided by the Postal Service and mailer. Id. We believe the publication of this information will permit competitors and mailers alike to verify that the Postal Service is complying with its mandate not to grant "undue or unreasonable" discrimination or preferences.
 
 2.
 
 71
 As we have noted, Sec. 403 provides the "[g]eneral duties" of the Postal Service. Subsection (b)(2) provides: "It shall be the responsibility of the Postal Service to provide types of mail service to meet the needs of different categories of mail and mail users." The district court held the ICM program violated Sec. 403(b)(2) because it serves "individual" users, not "categories" of users. UPS Worldwide Forwarding, 853 F.Supp. at 804-05. We disagree.
 
 
 72
 The ICM program is open to those customers capable of tendering one million pounds of international mail or paying two million dollars in international postage. We consider that group of customers to be a "category" of mail users, and believe the Postal Service is providing "mail service to meet the needs" of that category of users by offering them the ability to negotiate individualized service plans to meet individual needs. Section 403(b) does not specify that, to meet the needs of a category of users, the Postal Service must give them all the same rate. In fact, the Postal Service may better "meet the needs" of large-volume mailers by offering them individualized service plans at individual rates.
 
 
 73
 But UPS contends that Sec. 403(b)(2) generally prohibits individually-negotiated rates. Once again, we disagree. As we have noted, Sec. 403(c) bars "undue or unreasonable" discrimination and preferences. That necessarily means that reasonable discrimination and preferences are permitted. See supra part IV.C.1. Furthermore, the various domestic mail provisions that require "uniform" rates demonstrate that Congress knew how to mandate uniformity and equality when it desired. See, e.g., 39 U.S.C. Sec. 3623(d) (requiring that rates for each class of letter mail be "uniform throughout the United States, its territories, and possessions"); id. Sec. 3683 (prescribing "[u]niform rates for books; films; other materials").
 
 
 74
 Finally, we fail to understand how the statement of "[g]eneral duties" of the Postal Service could forbid the ICM program. Instead of a restriction on the powers of the Postal Service, it merely enumerates, as its title indicates, the Service's "[g]eneral duties." Viewing the statutory scheme overall, Sec. 403 was intended to list "[g]eneral duties," while other sections of the PRA specified duties, powers, and limitations. There is nothing in this section that bars the Postal Service from doing more than the minimum required here. Thus, as long as the Postal Service provides service to "meet the needs of different categories of mail and mail users," it also may provide individualized service. See, e.g., 39 C.F.R. Sec. 3001.68, App. A, p 500.021 (describing the Postal Service's established "Custom Designed Service," in which customers negotiate with the Postal Service for specialized pick-up and delivery arrangements).
 
 3.
 
 75
 Section 407(a), governing "[i]nternational postal arrangements," provides that "[t]he Postal Service, with the consent of the President, may negotiate and conclude postal treaties or conventions, and may establish the rates of postage or other charges on mail matter conveyed between the United States and other countries." The district court held Sec. 407(a) requires the President to consent to new international postal rates. UPS Worldwide Forwarding, 853 F.Supp. at 806. On appeal, neither party disputes this holding. But UPS makes two arguments under Sec. 407(a).
 
 
 76
 a.
 
 
 77
 UPS contends the ICM service is prohibited by the phrase, "establish the rates of postage or other charges." UPS claims that "establish" means to "set up ... permanently" and "rates" are "standardized prices made available to the public at large." Appellee's Brf. at 25 (citations omitted). Thus, UPS asserts, Sec. 407(a) does not permit the individual rates found in the ICM service. We disagree. If "establish" means creating permanent rates, the Postal Service could never change its rates. We do not believe Congress intended that result. Furthermore, the word "rates" may well indicate, as UPS claims, "standardized prices available to the public at large," but Sec. 407(a) allows the Postal Service to "establish the rates of postage or other charges " (emphasis added). We believe the negotiated rates of the ICM service satisfy the latter part of the phrase, if not the former.
 
 
 78
 b.
 
 
 79
 UPS also alleges the President never manifested the requisite consent under Sec. 407(a). The Postal Service responds that the President consented by allowing the rates to take effect without objection. Because it is clear that the President never formally consented to the adoption of the ICM service, we must consider the historical practice under the statute.
 
 
 80
 As we noted, Congress enacted legislation in 1851 permitting the Postmaster General, "by and with the consent of the President," to change the international postal rates set by Congress. See Act of Mar. 3, 1851, ch. 20, Sec. 2, 9 Stat. 587, 588; see also Act of June 8, 1872, ch. 335, Sec. 167, 17 Stat. 283, 304. The statute remained essentially the same until 1970, when the PRA permitted the "Postal Service, with the consent of the President," to "establish" those rates.
 
 
 81
 Neither party has submitted any evidence that, from the adoption of the 1851 Act, the President ever has affirmatively manifested, by word or deed, his consent to changes in international rates. The Postal Service notes that international rates have changed at least sixty times since 1945, all without express presidential approval. See Aff. of John F. Alepa, Manager of Pricing, U.S. Postal Service, App. at 55-62; cf. Air Courier Conference of America v. United States Postal Serv., 959 F.2d 1213, 1222-23 (3d Cir.1992) ("Before the [PRA] was passed, international rates had been set by the Postmaster General's administrative fiat...."). Thus, the undisputed historical record indicates the President and postal authorities have long interpreted Sec. 407(a) as not requiring the affirmative consent of the President.
 
 
 82
 In its brief, UPS argues the Postal Service has offered no evidence that the President agrees with its interpretation of the Sec. 407(a) consent provision. See Appellee's Brf. at 41-42. But after submission of UPS's brief, the President published a memorandum in the Federal Register, delegating until completion of this appeal his authority under Sec. 407(a) to establish postage rates. 59 Fed.Reg. 65471 (1994). The memorandum provides:
 
 
 83
 [T]he Government argues that the explicit consent of the President is not required. In the view of the Government, to the extent that 39 U.S.C. 407(a) does require the President to consent, it does not require that consent be given in any particular manner. The Government's position is that the failure of the President to object to the establishment of international postage rates and other charges is consent to the establishment of such rates and other charges. This has been the practice of the Government for the past 120 years.
 
 
 84
 Id.
 
 
 85
 Nevertheless, after viewing the unique history of the application of Sec. 407(a), we believe the President has demonstrated how he has manifested his consent to action by the Postal Service. We decline UPS's invitation to prescribe certain procedural steps the President must take in this regard. Although such guidance might be necessary with different statutes, agencies, or branches of government, we believe it is inappropriate in this context. Although the President and the Postal Service now agree he may consent to international postal rate changes merely by not objecting, we rely only on the historical practice under Sec. 407(a) in upholding the ICM service.[15]
 
 D.
 
 86
 In challenging the Postal Service, its competitors characterize it as a "public service" and "essentially a public utility." See Appellee's Brf. at 11, 22. In the domestic area, we believe those descriptions are apt. In some ways, the skepticism surrounding the ICM service exists because the program seems antithetical to traditional notions of the Postal Service. We expect to pay the same price for a postage stamp as everyone else, not to have to bargain for the best rate. In this sense, the Postal Service is properly compared to a public utility that charges the same rate to all customers.
 
 
 87
 But the Postal Service retains its centuries-old monopoly only in the domestic market. In the international arena, Congress has freed the Postal Service from the constraints that protect domestic mail rates. See 39 U.S.C. Sec. 407(a); supra part IV.A. Without a monopoly to protect its international business, see 39 C.F.R. Secs. 320.6, 320.8, the Postal Service now faces competition from UPS and other entities. See supra part IV.B. Thus, the reasons that may compel a uniform rate for postage in the United States no longer apply to large-volume international mailers.
 
 
 88
 In enacting the PRA, Congress repeatedly explained the fundamental reason for the dramatic changes mandated by the Act; it wanted the Postal Service to operate less like a bureaucratic agency and more like a business. The relevant committee reports repeat this principle again and again. See, e.g., H.R. No. 1104, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.C.C.A.N. 3649, 3660 ("The Postal Service is a public service but there is no reason why it cannot be conducted in a businesslike way and every reason why it should be.").[16]
 
 
 89
 While Congress hoped to achieve efficiency in postal operations by enacting the PRA, it also sought innovation. As the House Report noted, the Act "envisions a national postal service that is forever searching for new markets and new ways by which the communication needs of the American people can be served." H.R. No. 1104, 91st Cong., 2d Sess., reprinted in 1970 U.S.C.C.A.N. at 3668-69.[17] We believe the ICM service constitutes an appropriate part of that effort.
 
 V.
 
 90
 As a final matter, we consider the proper level of deference to be accorded the Postal Service's interpretation of the PRA. The Postal Service contends its regulations are to be given "controlling weight" as long as they represent a "reasonable interpretation" of the statute, pursuant to Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984). We confronted this general issue in Air Courier Conference v. United States Postal Service, 959 F.2d 1213, 1223-25 (3d Cir.1992), and we found Chevron to be controlling.
 
 
 91
 In Air Courier Conference, we considered whether the PRA required the Postal Rate Commission to consider any Postal Service change to international rates. 959 F.2d at 1215-16. In deciding the PRA did not require it, we noted the Postal Service and the Commission agreed that the latter agency played no part in international rate-making. We found the "argument that the Postal Service's bureaucratic bias lessens the need for deference is counter-balanced by the express acquiescence of the Commission in the Postal Service's view." Id. at 1225. As UPS notes, such concurring agency views do not exist here.
 
 
 92
 In reaching our decision in favor of the Postal Service, we have been convinced that Congress intended the PRA to permit the agency to operate more like a private business. See supra part IV.D. As the Supreme Court has noted, "[b]y launching 'the Postal Service into the commercial world,' and including a sue-and-be-sued clause in its charter, Congress has cast off the Service's 'cloak of sovereignty' and given it the 'status of a private commercial enterprise.' " Loeffler v. Frank, 486 U.S. 549, 556, 108 S.Ct. 1965, 1970, 100 L.Ed.2d 549 (1988) (citations omitted). Because in this case we construe a Postal Service regulation explicitly designed to "attract customers that currently use its competitors," see 58 Fed.Reg. 29778, 29780, it would appear that a reduced level of deference is appropriate here. But we are convinced the ICM service does not contravene the PRA, and so we do not rely on any deference that might be due.
 
 VI.
 
 93
 For the reasons expressed, we will reverse the judgment of the district court.
 
 
 
 *
 The Honorable Harlington Wood, Jr., United States Circuit Judge for the Seventh Judicial Circuit, sitting by designation
 
 
 [1]
 Section 101 provides statements of "Postal policy":
 ....
 (d) Postal rates shall be established to apportion the costs of all postal operations to all users of the mail on a fair and equitable basis.
 
 
 [2]
 Section 403 provides the "[g]eneral duties" of the Postal Service:
 (b) It shall be the responsibility of the Postal Service--
 ....
 (2) to provide types of mail service to meet the needs of different categories of mail and mail users....
 ....
 (c) In providing services and in establishing classifications, rates, and fees under this title, the Postal Service shall not, except as specifically authorized in this title, make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user.
 
 
 [3]
 Section 407 governs "[i]nternational postal arrangements":
 (a) The Postal Service, with the consent of the President, may negotiate and conclude postal treaties or conventions, and may establish the rates of postage or other charges on mail matter conveyed between the United States and other countries. The decisions of the Postal Service construing or interpreting the provisions of any treaty or convention which has been or may be negotiated and concluded shall, if approved by the President, be conclusive upon all officers of the Government of the United States.
 
 
 [4]
 Section 320.8 suspends the postal monopoly for "international remailing," which involves "bypassing the Postal Service and using private courier systems to deposit with foreign postal systems letters destined for foreign addresses." Air Courier Conference, 498 U.S. at 520, 111 S.Ct. at 915-16
 
 
 [5]
 See 39 C.F.R. Secs. 320.6, 320.8 (1994); see also supra part II
 
 
 [6]
 Intervenor ACCA contends that the Postal Service has waived its right to object to prudential standing because of its notice in the Federal Register announcing the ICM service:
 Since the Postal Rate Commission does not have jurisdiction to challenge over international rates, the Postal Service's competitors cannot challenge ICM or any other international rates in that forum. However, the Postal Service's competitors can seek judicial review of ICM rates just like they can seek judicial review of other international rates.
 
 
 [58]
 Fed.Reg. 29778, 29782 (1993)
 Despite the Postal Service's statement inviting judicial review, it is uncertain whether prudential standing may be waived. The Supreme Court has given mixed signals. In Craig v. Boren, 429 U.S. 190, 192-94, 97 S.Ct. 451, 454-55, 50 L.Ed.2d 397 (1976), the Court hinted that the first prudential standing requirement--which requires a party to assert its own rights, not the rights of others--could be waived by a defendant. See Elkin v. Fauver, 969 F.2d 48, 52 n. 1 (3d Cir.) (citing Craig for the proposition that "prudential standing [is] not jurisdictional"), cert. denied, --- U.S. ----, 113 S.Ct. 473, 121 L.Ed.2d 379 (1992); Lindley for Lindley v. Sullivan, 889 F.2d 124, 128-29 (7th Cir.1989) (similarly citing Craig ). But, in later cases, the Supreme Court has indicated plaintiffs always must satisfy the prudential standing rules. In Bender v. Williamsport Area School District, 475 U.S. 534, 546 n. 8, 106 S.Ct. 1326, 1334 n. 8, 89 L.Ed.2d 501 (1986) (citing Warth v. Seldin, 422 U.S. 490, 517-18, 95 S.Ct. 2197, 2214-15, 45 L.Ed.2d 343 (1975)), the Court stated:
 The rules of standing, whether as aspects of the Art. III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention. It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.
 Furthermore, recent Supreme Court opinions have held broadly that a party may never waive standing, but they have not expressly cited prudential standing. See, e.g., United States v. Hays, --- U.S. ----, ----, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995) ("The question of standing is not subject to waiver...."); National Org. for Women, Inc. v. Scheidler, --- U.S. ----, ----, 114 S.Ct. 798, 802, 127 L.Ed.2d 99 (1994) ("Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation.").
 From these cases, many of our sister circuits have determined that prudential standing cannot be waived. See Community First Bank v. National Credit Union Admin., 41 F.3d 1050, 1053 (6th Cir.1994) ("We find no authority for the plaintiffs' argument that prudential standing requirements may be waived by the parties. Recognizing a distinction between prudential and constitutional standing requirements in this context might give careless parties power to override congressional intent."); Animal Legal Defense Fund, Inc. v. Espy, 29 F.3d 720, 723 n. 2 (D.C.Cir.1994) ("Standing, whether constitutional or prudential, is a jurisdictional issue which cannot be waived or conceded."); Thompson v. County of Franklin, 15 F.3d 245, 248 (2d Cir.1994) (quoting National Wildlife Fed'n v. United States, 626 F.2d 917, 924 (D.C.Cir.1980)) ("[A]ppellee's purported waiver of prudential standing challenge is necessarily ineffective because standing implicates federal jurisdiction."). At least one circuit has resolved the issue differently. See Lindley for Lindley v. Sullivan, 889 F.2d 124, 128-29 (7th Cir.1989) ("Because the Secretary failed to suggest in the district court that prudential considerations should bar David from suing on his parents' behalf, we cannot consider these arguments here.").
 Our jurisprudence has not decisively settled the matter. Recently, we raised the matter of constitutional and prudential standing, even when the parties agreed that standing existed. See Wheeler v. Travelers Ins. Co., 22 F.3d 534, 537 (3d Cir.1994) (citation omitted) ("[W]e have an independent obligation to consider jurisdictional issues, and 'the doctrine of standing ... goes to the subject matter jurisdiction of the district court and the validity of its judgment ab initio.' "); see also Bennun v. Rutgers State Univ., 941 F.2d 154, 168 (3d Cir.1991) (referring to "those constitutional and prudential [standing] limitations that restrict a court's power to act and so must be resolved before we can proceed further on the merits"), cert. denied, 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992). But in Elkin, 969 F.2d at 52 n. 1, while defendants did not challenge plaintiff's standing, we analyzed the issue because of our "independent obligation to ensure that federal jurisdiction is present in cases that come before us." Although we found that plaintiff satisfied the Article III standing requirements, we declined to decide whether he satisfied the prudential rules. Id.; see also Ditri v. Coldwell Banker Residential Affiliates, Inc., 954 F.2d 869, 872 (3d Cir.1992) ("We find it unnecessary to decide the so-called standing issue which would, at best, only involve prudential standing.").
 Because we determine that UPS has standing here, we need not resolve the issue of whether prudential standing may be waived.
 
 
 [7]
 See also Investment Co. Inst. v. Camp, 401 U.S. 617, 621, 91 S.Ct. 1091, 1094, 28 L.Ed.2d 367 (1971) (holding that association of investment companies had standing to challenge regulation authorizing banks to operate collective investment funds); Arnold Tours, Inc. v. Camp, 400 U.S. 45, 46, 91 S.Ct. 158, 159, 27 L.Ed.2d 179 (1970) (holding that travel agents had standing to challenge decision to allow banks to provide travel services to their customers)
 
 
 [8]
 Under 39 U.S.C. Sec. 410(a), the Postal Service is not covered by chapters 5 and 7 of Title 5, the provisions of the Administrative Procedure Act that involve "Administrative Procedure" and "Judicial Review." In Air Courier Conference, the Supreme Court declined to determine whether Sec. 410(a) exempts the Postal Service from judicial review under the APA, holding that the Postal Service had waived the issue. 498 U.S. at 522-23 & 523 n. 3, 111 S.Ct. at 916-18, 917 n. 3. But see id. at 531-32, 111 S.Ct. at 921-22 (Stevens, J., dissenting). Similarly, although the Postal Service briefly mentions the issue in a footnote, see Appellant's Brf. at 11 n. 3, it states it is "content" to have this case judged under the "zone of interests" test. See Appellant's Reply Brf. at 3 n. 1. Thus, we consider the matter waived
 
 
 [9]
 In Air Courier Conference, the trade association ACCA intervened on behalf of the Postal Service and argued the unions lacked standing, leaving the Postal Service only a "nominal[ ]" litigant. 498 U.S. at 520, 522, 111 S.Ct. at 915-16, 916-17. Ironically, the Postal Service in this case is attempting to use that decision against ACCA so as to deny it the right to intervene and UPS the right to litigate
 
 
 [10]
 For the text of these sections, see supra notes 1-3
 
 
 [11]
 In view of the "integral relationship" language, we do not interpret Air Courier Conference as establishing a strict zone of interests test contrary to previous Supreme Court precedent, such as Clarke, where the Court stated that the zone of interests "test is not meant to be especially demanding." 479 U.S. at 399, 107 S.Ct. at 757. Air Courier Conference, we note, merely held that a recodification of an entire title of the United States Code, covering hundreds of statutory provisions developed over the course of two centuries, did not constitute one "statute," within the meaning of the zone of interests test. See Air Courier Conference, 498 U.S. at 529-30, 111 S.Ct. at 921 ("The statutory provisions enacted and reenacted in the PRA are spread over some 65 pages in the United States Code and take up an entire title of that volume.... [T]o accept this level of generality in defining the 'relevant statute' could deprive the zone-of-interests test of virtually all meaning.")
 
 
 [12]
 For the same reasons we hold UPS to have standing, we find that ACCA has standing to intervene in this case
 
 
 [13]
 It is instructive that the Universal Postal Union, the United Nations agency governing international mail, permits postal authorities to "give preferential rates to major users of the Post." See 58 Fed.Reg. 29778 (citing UPU Convention, art. 20, p 15)
 
 
 [14]
 Other courts have reached similar conclusions. In Aimes Publications, Inc. v. United States Postal Service, Civ. A. No. 86-1434, 1988 WL 19618, at * 6 (D.D.C. Feb. 23, 1988), the court noted the Postal Service's enforcement of its second-class statutory rules apparently was "at best, uneven," but it found no violation of Sec. 403(c). The court stated that "[t]ypically, the court[s] have given the Postal Service broad discretion in administering the classification scheme, which necessitates differentiating among users." Id. at * 7 n. 13. And in Egger v. United States Postal Service, 436 F.Supp. 138 (W.D.Va.1977), a student challenged a Postal Service policy that provided a different level of service to single students living in university housing than that provided for married students. In upholding the different service levels, the court noted:
 While it is obvious that [Sec. 403(c) ] prohibits undue or unreasonable discrimination among users in the provision of delivery services, it is also equally obvious that the Postal Service may provide different levels of delivery service to different groups of mail users so long as the distinctions are reasonable. The goal sought by the Postal Service in the instant case by their discrimination is the efficient and economical delivery of the mail. The goal is legitimate and the only question before the court is whether the distinctions between the three groups are rationally related to the achievement of the goal.
 Id. at 142; see also Time, Inc. v. United States Postal Serv., 710 F.2d 34, 41 n. 8 (2d Cir.1983) (holding that the disparities between the contribution to the Postal Service's fixed costs from each class of mail service "are not so great as to amount to 'undue or unreasonable discrimination among users of the mails' "); Direct Mail/Mktg. Ass'n, Inc. v. United States Postal Serv., 501 F.2d 717, 722 (D.C.Cir.1974) (upholding temporary rate changes that allegedly discriminated against third-class mailers in violation of Sec. 403(c) because the Postal Service action was "manifestly reasonable"); Ludewig v. Wolff, 492 F.Supp. 1048, 1049 (S.D.Tex.1980) (finding no violation of Sec. 403(c) "because the distinctions made by the regulations are reasonably related to the effectuation of the pertinent objectives of the Postal Reorganization Act").
 
 
 [15]
 UPS contends the Postal Service never argued before the district court that the President consented to the ICM service; thus, UPS claims, the Postal Service has waived this argument. Although the Postal Service disputes that it waived the issue, we need not decide the question. We may "review a waived issue under exceptional circumstances," such as when the "public interest" so requires. Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107, 117 (3d Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993). Because this case involves the President's authority to determine the manner of his consent to agency action and the validity of more than a century's worth of international postal rates, we hold that "exceptional circumstances" exist here
 
 
 [16]
 See also H.R.Rep. No. 1104, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.C.C.A.N. 3649, 3650 (The PRA is intended to "[e]liminate serious handicaps that are now imposed on the postal service by certain legislative, budgetary, financial, and personnel policies that are outmoded, unnecessary, and inconsistent with the modern management and business practices...."); id. at 3653 ("Top management must be given authority, consistent with its responsibilities, to provide an efficient and economical postal system. Postal management has been severely and unjustly hampered in its efforts to administer the Department in a businesslike way."); id. at 3654 (The bill provides "authority to conduct the affairs of the Postal Establishment on a business like basis...."); id. at 3665 ("The mandate that the Postal Service must be self-supporting is essential if postal affairs are to be conducted with reasonable economy and efficiency."); S.Rep. No. 912, 91st Cong., 2d Sess. 3 U.S.Code Cong.Serv.1970, p. 3649 (1970) ("[P]ostal management must now be given the unfettered authority and freedom it has been denied for years to maintain and operate an efficient service."); id. ("[T]he laws controlling the governance of the [Post Office] Department have become excessively restrictive and [ ] it is not too soon for a complete break with the past.")
 
 
 [17]
 See also H.R.Rep. No. 1104, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.C.C.A.N. 3649, 3657 ("The Postal Service is empowered to engage in research and development programs directed toward the expansion of present postal service and the development of new services responsive to the evolving needs of the United States"); id. at 3668 (The PRA "is designed to prevent public service from involving public wastefulness in postal matters. This must be done not only by requiring postal management to operate efficiently and economically, but also by requiring it to seek out the needs and desires of its present and potential customers--the American public."); S.Rep. No. 912, 91st Cong., 2d Sess. 3 U.S.Code Cong.Serv.1970, p. 3649 (1970) (noting prior postal laws "inhibit[ed] innovation and imagination in the management of the Post Office")