# Applicability of 18 U.S.C. § 1721 to Collection of Fee for Stamped Cards

The Postal Service may charge a fee for stamped cards in addition to the face value of the postage without violating 18 U.S.C. § 1721.

January 7, 1999

## MEMORANDUM OPINION FOR THE VICE PRESIDENT AND GENERAL COUNSEL
## UNITED STATES POSTAL SERVICE

This responds to your letter of July 27, 1998, requesting the Justice Department's legal opinion whether the provisions of 18 U.S.C. § 1721 (1994) prohibit the sale of stamped cards for a one-cent fee that has been authorized by the Postal Service Board of Governors and that is to be charged in addition to the value of the postage charge identified on the stamp that appears on the face of the cards.[1] We conclude that § 1721 is not properly construed to impose such a prohibition.

## I.

"Stamped cards," formerly known as postal cards or postcards, are postcard-sized items of stationery bearing a preprinted postage marking. They are presently sold by the U.S. Postal Service ("Service") at postal retail units throughout the United States at a price of twenty cents per card. Heretofore, the Postal Service has not charged a separate fee for the cost of the stationery component — as distinguished from the face postage value — of stamped cards. Consequently, the price currently recovered by the Service for stamped cards accounts for postage value only; the stationery component is effectively provided free of charge.

Pursuant to its statutory authority to establish postal rates, fees, and classifications, the Service has undertaken to establish a new fee on stamped cards that would enable it to recover its costs for the stationery component.

Under the procedures established by the Postal Reorganization Act, Pub. L. No. 91–375, 84 Stat. 719 (1970) ("PRA"), changes in postal rates, fees, or classifications are initiated when the Postal Service proposes the change to the independent Postal Rate Commission ("Commission"). *See* 39 U.S.C. § 3622 (1994), *as amended by* Postal Employees Safety Enhancement Act, Pub. L. No. 105–241, § 5, 112 Stat. 1572, 1573 (1998) ("PESEA"); *id.* § 3623. If the Commission favor-

---

[1] Letter for the Honorable James K. Robinson, Assistant Attorney General, Criminal Division, from Mary S Elcano, Senior Vice President and General Counsel, U.S. Postal Service (July 27, 1998) ("USPS Letter"). Your inquiry was referred to this Office for response *See* 28 C F R § 0.25(a) (1998) We requested, and you have provided, the Service's agreement to be bound by our opinion on this issue *See* Letter for Beth Nolan, Deputy Assistant Attorney General, Office of Legal Counsel, from Mary S. Elcano, Senior Vice President and General Counsel, U.S Postal Service (Aug. 14, 1998).

ably recommends the Service's proposal, the Governors of the Postal Service ("Governors") are vested with the ultimate authority to approve or reject new rates, fees, and classifications. *See id.* §§ 3624, 3625. Changes adopted by the Governors are then formally promulgated as provisions of the Domestic Mail Classification Schedule ("DMCS"), which is published at 39 C.F.R. pt. 3001, subpt. C, app. A (1998), and in the form of Postal Service rules implementing changes to the Domestic Mail Manual ("DMM"). *See* 39 U.S.C. § 401(2) (1994); 39 C.F.R. pt. 111 (1998).

In 1996, the Service petitioned the Commission to recommend the adoption of a new two-cents fee to be paid on the purchase of stamped cards to recover the costs of manufacturing such cards. In the proceedings before the Commission, two individual mailers intervened in opposition to the proposed fee. Among other things, the intervenors argued that collection of the fee would violate 18 U.S.C. § 1721, a criminal statute, which provides in relevant part:

> Whoever, being a Postal Service officer or employee, knowingly and willfully: . . . sells or disposes of postage stamps or postal cards for any larger or less sum than the values indicated on their faces; or sells or disposes of stamped envelopes for a larger or less sum than is charged therefor by the Postal Service for like quantities; . . . or sells or disposes of postage stamps, stamped envelopes, or postal cards, otherwise than as provided by law or the regulations of the Postal Service; shall be fined under this title or imprisoned not more than one year or both.

The Commission did not reach the intervenors' contentions regarding § 1721 in its initial disposition. Although it declined to recommend adoption of the proposed fee at that time on factual grounds unrelated to the issue posed here, the Commission did recommend the fee classification proposed by the Service in the form of a "shell classification" — i.e., a classification earmarked for distinct rate treatment, but without the recommendation of any particular current rate level.

In 1997, the Service again proposed adoption of the two-cents card fee to the Commission, and one of the previously noted intervenors again contended that charging such a fee would violate 18 U.S.C. § 1721. The Commission Presiding Officer, however, determined that the proposed fee "likely" would not violate § 1721, stating "[e]ven if the face value of a stamped card did not equal its price, postal employees would likely not be in violation of the statute." Presiding Officer's Ruling on Popkin's Motion to Dismiss, No. R97–1/31, at 3 (Sept. 26, 1997) ("Popkin Ruling").

Subsequently, the Commission issued a decision recommending a one-cent fee for stamped cards over and above the twenty-cents postage charge.[2] In June 1998, the Governors approved the one-cent fee on stamped cards, "in addition to postage," under the authority of 39 U.S.C. § 3625, and determined that the fee would go into effect on January 10, 1999. The authorized fee was officially published in the form of a change to the DMCS, domestic rates and fees. *See* Changes in Domestic Rates, Fees, and Mail Classifications, 63 Fed. Reg. 39,124, 39,145, and 39,163 (1998).[3] Further implementing the authorized fee, the Postal Service promulgated a Final Rule on July 14, 1998, setting forth the DMM standards adopted by the Service to implement, among numerous other new provisions, the stamped card fee approved in the Decision of the Governors of the Postal Service in Postal Rate Commission Docket No. R97–1. *See* Domestic Mail Manual Changes To Implement the Rate, Fee, and Classification Changes in Docket No. R97–1, 63 Fed. Reg. 37,946, 37,957 (1998) (to be codified at 39 C.F.R. pt. 111). The new provision of the DMM states:

> A $0.01 fee per stamped card and a $0.02 fee per double stamped card will be added to cover manufacturing and printing costs. A fee of $0.40 will be added to the price of a sheet of 40 stamped cards. This is consistent with the existing fee structure for stamped envelopes, where customers are charged postage plus a small fee for the envelope itself.

*Id.* at 37,957.

In light of the intervenors' contentions in the rate proceedings, you have sought the Department's opinion as to whether charging the one-cent fee on the stamped cards, without changing the postage imprinted on the cards to include the amount of that fee,[4] would result in criminal violation of 18 U.S.C. § 1721.

---

[2] The reasons why the Commission recommended (and the Governors later approved) a one-cent fee rather than the two-cents proposed by the Service was explained by the Commission as follows "A one-cent fee for a stamped card easily covers manufacturing costs and makes an adequate contribution with a cost coverage of 125 percent . . . The cost coverage should be relatively low for this service, so that it will provide a low cost method by which an individual can send mail " Opinion and Recommended Decision, Docket No R97–1, at 595 (Postal Rate Commission, May 11, 1998).

[3] The Domestic Mail Classification Schedule is incorporated by reference in the Postal Regulations set forth at 39 C.F.R § 111.1 (1998).

[4] We are advised that it would be financially and otherwise impracticable for the Service to alter or modify its large existing inventory of stamped cards so that the face value imprinted on the cards (presently twenty-cents) would be increased to twenty-one cents, reflecting the one-cent non-postage fee in addition to postage value *See* USPS Letter at 4. Moreover, because the price indicia stamped on the existing cards represents the cost of *postage only*, it would appear anomalous and misleading to alter the stamped price to read "twenty-one cents" when the actual postage value is only twenty-cents

## II.

In its various submissions to the Commission and the Governors, the Service has asserted that charging the one-cent fee on stamped cards, in addition to the imprinted postage of twenty-cents, would not result in violation of 18 U.S.C. § 1721. Invoking the relevant legislative history, the Service argues that the criminal statute was enacted solely to remedy fraudulent pricing practices engaged in by postmasters in order to inflate their salaries; that § 1721 is therefore concerned solely with *unauthorized* price manipulation by postal employees; and that it is in no way intended to prevent the authorized collection of supplemental postal fees duly approved by the postal authorities. *See* USPS Letter at 4. The Service also contends that interpreting § 1721 to prohibit implementation of the proposed fee arrangement would be inconsistent with the powers and authorities designedly granted the Service by Congress under the PRA. As the Service asserted in a brief to the Commission:

> A stamped card fee would not give rise to a violation of section 1721, since, if implemented, it would be entirely consistent with the policies of Postal Service management, and therefore would not result in the unauthorized sale of postage at inflated rates. It is evident that Congress did not intend the restrictions in 1721 to apply to pricing policies recommended by the Commission, approved by the Governors, and implemented by postal management, since, simultaneously with the enactment of conforming amendments to section 1721 adopted in connection with the Postal Reorganization Act and 39 U.S.C. § 410(b)(2), Congress contemplated that mail classifications such as postal cards would be subject to change, as it created an elaborate scheme for the implementation of and changes to the Domestic Mail Classification Schedule. *See* 39 U.S.C. §§ 3623, 3625.

Reply Brief of United States Postal Service at 111, Special Services Reform, 1996, U.S. Postal Rate Commission, Docket No. MC96–3 (1997).

The Service's position was subsequently endorsed by the Commission Presiding Officer in his opinion denying the intervenor's motion to dismiss based on the § 1721 argument. The Presiding Officer concluded:

> Even if the face value of a stamped card did not equal its price, postal employees would likely not be in violation of the statute. As the Postal Service convincingly argues, this particular criminal statute appears to have been aimed at preventing the misuse of postal items by postal employees attempting to increase their sala-

ries (postmasters' salaries are determined in part by a post office's revenues). By all appearances, it is not an effort to regulate postal fees. It would be remarkable if Congress had regulated postal fees by criminalizing conduct. "If Congress wished to prevent the Postal Service from authorizing the sale of stamped cards for a fee in addition to postage, Congress would have enacted a law directed at the Postal Service rather than its individual employees and officers." Opposition at 4 n.2.

Popkin Ruling at 3.

The Postal Service also invokes an early opinion of the Solicitor of the Post Office Department to bolster its position that § 1721 is solely concerned with unauthorized sales and pricing practices by postal employees, as distinct from official changes in postage rates and fees authorized by the Service under the provisions of the PRA. As the Postal Solicitor's opinion explained with reference to the "face value" sale requirements of an earlier version of § 1721:

> [B]ut accepting the broad and specific terms of the law as applying here, it must be borne in mind that this is a criminal statute, and in order to constitute a violation a criminal intent is necessary, and while it is well established that intent may be presumed from the commission of the acts prohibited, *the circumstances in this case* would negative the existence of such intention, *especially should the procedure be authorized by the department. . . .* For it is to be observed that the purpose of the law is not to secure an exact return, for accounting purposes or otherwise, for the stamped paper disposed of, *but to regulate and control postal employees in their handling of stamped papers, this being apparent from the numerous other provisions of the law.*

6 Op. Solicitor of the Post Office 652, 655 (1918) (emphasis added).[5]

Thus, the Service, the Commission, and the Post Office Solicitor's early opinion all appear to agree on the basic proposition that the relevant requirement of 18 U.S.C. § 1721 was intended to apply only to unauthorized and deceptive acts or transactions by Postal employees, and has no proper application to their implementation of authorized fee provisions adopted by the Service in accordance with the provisions of the PRA.

---

[5] That opinion concerned the peculiarities of U.S. postal operations in Shanghai, China, where a Postmaster General order was proposed that provided for the sale of stamps to the public in exchange for foreign currency pegged to the value of the prevailing daily rate of exchange of U.S currency. The issue presented was whether the sale of stamps during periods when the banks were closed and, consequently, no official exchange rate (and therefore no accurate sales value) could be ascertained, would constitute a violation of the version of § 1721 then in effect Based on the considerations quoted above, the Solicitor concluded that no violation of the statute would result

By contrast, the intervenors in the Commission's proceedings argued that § 1721, by its terms, applies to criminalize the sales arrangements proposed by the Service. Section 1721 prohibits the sale by postal employees "of postage stamps or postal cards for any larger or less sum than the values indicated on their faces," and it makes no express exception for official actions. Because postal employees would be selling stamped cards bearing a twenty-cents postage indicia on their face for a total sales price of twenty-one-cents, it has been argued that the sale of the cards would constitute sales for a "larger . . . sum than the values indicated on their faces." 18 U.S.C. § 1721.

## III.

### A.

In determining whether the Service's proposed sales arrangement for the stamped cards would violate the criminal prohibition set forth in § 1721, we need not resolve whether the Service is correct to contend that the criminal prohibition is inapplicable to official, authorized acts by Service employees. For even if we assume that § 1721 may apply to some official, authorized acts, we do not believe that the plain text of § 1721 bars the proposed sales arrangement that we have been asked to consider. To see why this is so, it is important to consider not only the precise terms of § 1721, but also the overall statutory structure and relevant legislative history, each of which supports the conclusion that the Service's proposed sales arrangement comports with the terms of the criminal prohibition.[6]

### B.

The Service agrees that the literal terms of the statutory prohibition set forth in § 1721, which bars the sale of "postage stamps or postal cards" for sums greater or less than the "values indicated" on their faces, applies to the sale of "stamped cards." The Service concedes that "stamped cards" are "postal cards" for purposes of § 1721, and thus that the criminal prohibition applies to stamped cards in the same manner that it would apply to any type of postal cards. The analysis that follows, therefore, accords no weight to the fact that the Service has designated the sales item in question here with a name — "stamped cards" — that does not expressly appear in § 1721.

The analysis that follows does accord weight, however, to the Service's contention that, in adopting the proposed sales arrangement, it has exercised the discretion that Congress has delegated to it pursuant to the PRA. The Service's contention is important because the enactment of the PRA dramatically altered the legis-

---

[6] The Criminal Division of the United States Department of Justice concurs in this conclusion. *See* Memorandum for Beth Nolan, Deputy Assistant Attorney General, Office of Legal Counsel, from James K. Robinson, Assistant Attorney General, Criminal Division, *Re· Collection Fee for Stamped Cards* (Dec. 30, 1998)

lative and regulatory context in which postal pricing and sales practices — including those covered by 18 U.S.C. § 1721 — must be evaluated. Indeed, Congress amended § 1721 at the time that it enacted its postal reform legislation and thereby expressly linked the existing criminal prohibition with the broader statutory and regulatory changes effected by the PRA. *See* Pub. L. No. 91–375, sec. 6(j)(29), § 1721, 84 Stat. 719, 780 (1970) (extending the prohibition to the sale of postal cards and other postal items "otherwise than as provided by law or the regulations of the *Postal Service*.").[7]

Most significantly, the PRA shifted control over postal pricing and sales practices from Congress to the Service. *See National Ass'n of Greeting Card Publishers v. U.S. Postal Service*, 462 U.S. 810, 813 (1983) (citation omitted) ("When, in 1970, Congress enacted the Postal Reorganization Act, it divested itself of the control it theretofore had exercised over the setting of postal rates and fees."). In doing so, Congress afforded the Service broad discretion to carry out its functions in a businesslike and cost-effective manner. *See* S. Rep. No. 91–912, at 2 (1970) ("[P]ostal management must now be given the unfettered authority and freedom it has been denied for years to maintain and operate an efficient service."); 39 U.S.C. § 404(a)(2) (1994) (giving the Service specific authority "to prescribe, in accordance with this title, the amount of postage *and the manner in which it is to be paid*") (emphasis added); *id.* § 401(2) (granting the Service authority "to adopt, amend, and repeal such rules and regulations as it deems necessary to accomplish the objectives of [the PRA]."). Accordingly, § 1721 should be construed, to the extent that its text will allow, in a manner that will permit the Service to exercise the kind of broad discretion to establish fee changes and to implement them in a businesslike and cost-efficient manner that appears to have been contemplated by Congress when it enacted the PRA.

Here, the Service's proposal to sell postal cards for twenty-one cents, adopted to recover the cost of producing the stationery component of such cards, furthers the statutory purpose of ensuring that postal items are sold for amounts that reflect the costs of their production. Specifically, the PRA requires that postal rates and fees must be established in accordance with "the requirement that each class of mail or type of mail service bear the direct and indirect postal costs attributable to that class or type plus that portion of all other costs of the Postal Service reasonably assignable to such class or type." 39 U.S.C. § 3622(b)(3). The addition of a one-cent fee for the costs of the stationery plainly comports with that statutory command, as the Service has determined that the postage price no longer accounts for the costs of the stationery on which the postage mark appears.

In addition, the Service's proposal to sell its existing inventory of postal cards at the new price, even though these cards do not set forth the new sales price on their face, furthers the statutory purpose of ensuring that fee changes are imple-

---

[7] Formerly, the statutory prohibition had applied to the "Post Office Department." *See* Act of June 25, 1948, ch 645, § 1721, 62 Stat. 683, 783.

mented in a businesslike and cost-effective manner. *See UPS Worldwide Forwarding, Inc. v. United States Postal Service*, 66 F.3d 621, 638 (3d Cir. 1995), *cert. denied*, 516 U.S. 1171 (1996) (explaining that "[i]n enacting the PRA, Congress repeatedly explained the fundamental reason for the dramatic changes mandated by the Act; it wanted the Postal Service to operate less like a bureaucratic agency and more like a business. The relevant committee reports repeat this principle again and again."); *see, e.g.*, H.R. Rep. No. 91–1104, at 11 (1970), *reprinted in* 1970 U.S.C.C.A.N. 3649, 3660 ("The Postal Service is a public service but there is no reason why it cannot be conducted in a businesslike way and every reason why it should be."). As we have noted, the Service has advised that it would be financially and otherwise impracticable to alter its large, existing inventory of postal cards to account for the newly-determined fee on the face of those cards. *See* USPS Letter at 4. The Service's proposed sales arrangement therefore would appear to promote the statutory aim of economic efficiency by implementing the new fee for postal cards — which has been selected to serve the congressional mandate that the fee reflect all of the costs of production — in a manner that makes use of already-printed postal cards without incurring substantial alteration costs.

The foregoing analysis demonstrates that the adoption of the intervenors' proposed construction of the criminal prohibition set forth in § 1721 of title 18 would effectively preclude the Service from adopting a cost-effective means of implementing a fee change that meets the statutory requirement that postal fees reflect all of the costs of the production of the postal item. Because the Service's proposed sales arrangement appears to represent an exercise of the very type of discretion in the implementation of a fee change that Congress appears to have contemplated when it enacted the PRA, § 1721 should be construed to preclude the exercise of that discretion only if the plain terms of the criminal prohibition would compel that result. In our view, as we explain more fully below, they do not.

## C.

The proposed sales arrangement arguably contravenes the plain terms of § 1721's face-sale provision in two distinct ways. First, the Service proposes to sell postal cards for a price — twenty-one cents — that is not set forth on their face. Second, the Service proposes to sell these cards for a price that is greater than the only monetary amount that does appear on their face — namely the amount set forth on the twenty-cents postage stamp that is imprinted on the face of the card.

To assess the seriousness of these two potential points of conflict between the statutory text and the Service's proposed sales arrangement, it is necessary to answer two questions. First, does § 1721 require that postal cards indicate a value

on their face? If it does not, as we conclude below, then the Service may authorize the sale of postal cards for an amount — twenty-one cents — that is not indicated on the face of the card. This conclusion, however, leads to a second question: Even if the value need not be indicated on the face of the card, when a monetary amount *does* appear on the face of a postal card in the form of the price of the postage stamp, is the postage amount the only price at which the card may be sold, or is it possible that the card may be sold for a value other than the postage amount? If the latter is possible, as we also conclude below, then the Service may authorize the sale of a postal card for an amount that is greater than the stamped postage mark and that is not otherwise indicated on the face of the card.

In addressing the first question, it is clear that the plain terms of § 1721 are consistent with the conclusion that the Service may sell postal cards for an amount that is not specified on their face. That is, § 1721 does not require that the face of a postal card must indicate the value of the postal card. The statute prohibits the sale of a postal card for a sum greater or lesser than the indicated value of the postal card, but it does not, by its terms, mandate that the face of the postal card indicate what that value is. Nothing in the text of the criminal prohibition appears to require the conclusion, therefore, that the proposed sales arrangement would be prohibited by the face-sale provision of § 1721 simply because the Service proposes to sell cards that would not have set forth the official value of the cards, as opposed to the official value of the *postage* of the cards, on their face.

This reading of the statutory text accords with longstanding administrative practice with respect to the sale of postage stamps, which, like postal cards, are subject to the face-sale requirement of § 1721. The Service has regularly issued letter-series postage stamps, which do not indicate a monetary amount but have only a letter of the alphabet indicated on their faces, for a price authorized by the Service but not indicated on the faces of the stamps themselves. To be sure, letter-series stamps do contain a marking on their faces that signifies their value. The actual sales price that a purchaser must pay for the stamp, however, is not discernible from the face of the stamp. A purchaser may verify the official, authorize sales price only by consulting an official Service document that states the price of a stamp bearing a certain letter. In this respect, letter-series stamps are similar to postal cards that do not bear their sales price on their faces. In each case, a purchaser must look beyond the face of the postal item, and consult official materials, to determine the official price.

Thus, if § 1721, which requires that both postage stamps and postal cards be sold for no more or less than "the values indicated on their faces," imposed a requirement that these items always indicate the monetary amount of their sales price on their faces, then letter-series stamps would have been prohibited. Instead, however, the Service advises that letter-series stamps have not been considered

problematic under § 1721,[8] and Congress has not precluded the issuance of such letter-series stamps despite ample time within which to do so. This longstanding administrative practice with respect to postage stamps comports with our conclusion that the plain terms of the criminal prohibition do not require that the Service indicate the sale price of the postal cards on their faces.

We find additional support for our conclusion in the fact that § 1721 explicitly permits the sale of stamped envelopes at prices not indicated on their faces. The provision regarding stamped envelopes suggests that the criminal prohibition set forth in § 1721, when considered as a whole, was not intended to embody a general policy that the price of a postal item must be indicated on the face of the item. Such a policy, after all, would be inconsistent with the provision regarding stamped envelopes. As a result, the overall structure of the statutory criminal prohibition does not provide clear support for a conclusion that the plain terms of the face-sale provision should be construed to include, even if only implicitly, a requirement that the value of a postal card be indicated on its face.

Even though we do not believe that § 1721 precludes the sale of postal cards for an authorized amount not indicated on their faces, we are still left to consider the second question: whether postal cards must be sold at the price of the postage indicated whenever a postage amount *is* indicated on the faces of the cards. Here, the Service proposes to sell postal cards not only for an amount, twenty one cents, that would not appear on the faces of the cards, but also for an amount that would be greater than the only monetary value, twenty-cents, that would appear on the faces of the postal cards — namely, the amount of the postage price marked on the postage stamp. If § 1721 is properly construed so that such a monetary amount necessarily "indicates" the "value" of the card itself, then § 1721 arguably would appear, by its terms, to bar the proposed sales arrangement. If the provision may be construed so that such a monetary amount may be understood to "indicate" only the value of the postage, however, then the Service's sale for twenty-one cents of a card stamped with a twenty-cents postage mark would not contravene the express terms of the criminal prohibition. Under such a construction, the Service's sale for twenty-one cents of a postal card stamped with a twenty-cents postage mark would not be for a sum greater than the "value indicated" on the card's face because the card's face would indicate only the value of the postage and not the value of the card itself.

In our view, the plain text of § 1721 does not require the conclusion that the amount of postage that appears on a postal card necessarily constitutes the "value indicated" of a postal card, even when there is no express countervailing indication of the postal card's value on the face of such a postal card. The statutory text does not reveal, by its terms, the circumstances in which the face of a postal card may be said to have indicated the value of the postal card as opposed to

---

[8] Telephone conversation between George Smith, Attorney-Advisor, Office of Legal Counsel, and Anthony Alverno, Attorney, National Litigation Section, United States Postal Service (Dec. 22, 1998).

merely the value of the postage stamp that appears on the face of the postal card. The statutory text states only that a sale of a postal card may not be for a sum greater or lesser than the "value indicated" on the face of a postal card. As to whether the appearance of the monetary amount of a postal stamp on a postal card, without more, necessarily indicates the value of the postal card within the meaning of § 1721, the statutory text is silent.

The Service's last regulation that defined the term "postal cards" accords with a construction of the criminal prohibition in which the postage stamp that appears on the face of a postal card need not be understood to reflect the full value of the card itself. The regulation defined a postal card as follows: "A postal card is a card with postage imprinted or impressed on it and supplied by the Postal Service for the transmission of messages." 39 C.F.R., pt. 3001, subpt. C, appx. A, 222.11 (1996).[9] That definition suggests that the postal card is a distinct postal item from the postage that is impressed upon it, a suggestion that accords with the conclusion that the postage stamp that appears on the face of a postal card does not necessarily indicate the value of the card. The statutory prohibition on the sale of postal cards for a value greater than the "value indicated" on the face of the card would appear to be at least ambiguous, therefore, as to whether the textual phrase "value indicated on its face" refers only to the authorized sales price of the card in those cases in which such a value has been indicated on the face of the card, or whether that phrase is instead intended to refer to the sole monetary amount that appears on the face of the card even though the Service has concluded that such an amount actually refers only to the postage price.

The intervenors reject the notion that § 1721 may be read to be ambiguous on this point. Their plain meaning argument against the Service's proposed sales arrangement hinges largely on the contrast in the language that § 1721 employs with respect to postal cards as compared to stamped envelopes. The intervenors contend that because § 1721 refers to the value indicated on the face of postal cards, but not stamped envelopes, it is clear that § 1721 imposes an additional limitation regarding the manner of the sale of postal cards — namely, that they may not be sold for a monetary amount greater than the sole monetary amount that appears on their face, which, in the case before us, is the amount of postage that is stamped on the cards.

A review of the historical background to the current version of the criminal prohibition set forth in § 1721 demonstrates, however, that it is far from clear that the differing language in § 1721 on which the intervenors rely supports their plain meaning argument. At the time that Congress first enacted the criminal prohibition subsequently codified, without material alteration, as 18 U.S.C. § 1721, *see* Revised Statutes of the United States, 1873–1874, § 3920, at 762 (1878)

---

[9] This regulation was amended through subsequent regulation in 1996 so that the term "stamped card" replaced the term "postal card." *See* Amendment to Domestic Mail Classification Schedule, 61 Fed Reg. 32,656, 32,662 (1996).

("Revised Statutes"), *as amended by* Act of June 17, 1878, ch. 259, 20 Stat. 140, 141, it had statutorily established a single "postage charge" for postal cards of "one cent each, including the cost of their manufacture." *See* Act of June 8, 1872, ch. 335, § 170, 17 Stat. 283, 304. Congress had in this way set the postal card fee at a monetary amount that reflected both the cost of postage and the cost of manufacture. There was therefore no deviation between the postal charge and the value of the postal card at that time because Congress, in one legislative act, had established the value of the postal card to be the equivalent of the postal charge. Indeed, Congress did not even authorize the use of private post cards until 1898, well after it had enacted the face-sale provision of the criminal prohibition now codified in § 1721. Act of May 19, 1898, ch. 347, 30 Stat. 419. Thus, at the time Congress enacted the face-sale provision, there was no market, as there is today, for post cards that could be purchased for a fee separate from the costs of their postage stamps.

In contrast to its treatment of postal cards, Congress, at the time of the first enactment of the face-sale provision, had not established a similarly uniform, fixed statutory value for stamped envelopes. Indeed, it could not have because stamped envelopes were used to mail a wide variety of materials, including newspapers, of varying sizes, and thus no single cost could be affixed due to variations in both the applicable postage rates and the costs of producing differing types of envelopes. *See* 25 Op. Att'y Gen. 354, 359–60 (1905). Congress had instead provided by statute that the Postmaster General shall provide stamped envelopes and that such stamped envelopes "shall be sold, as nearly as may be, at the cost of procuring them, *with the addition of the value of the postage stamps* impressed thereon." *See* Revised Statutes, § 3915, at 761 (emphasis added). This framework meant that the face of a stamped envelope did not set forth the value of the envelope — it set forth only the value of the postage stamp that was impressed on the envelope. Accordingly, the statutory prohibition regarding the manner of the sale of stamped envelopes did not refer to the face value of the envelope but provided instead that such an envelope could not be sold or disposed of "for a larger or less sum than is charged therefor by the Post-Office Department for like quantities[.]" Act of June 17, 1878, 20 Stat. at 141; *see* Revised Statutes, § 3920, at 762. This statutory restriction served to ensure that the sale of stamped envelopes conformed to the authorized, albeit variable, fee for their purchase.

These historical facts regarding the state of nineteenth century postal law make it difficult to conclude that Congress clearly employed the differing language concerning stamped envelopes that appears in § 1721 in order to ensure that the face value of the postage stamp that appears on a postal card would necessarily indicate the value of the postal card itself. The historical context instead may be read to suggest that the face-sale provision was intended to ensure that postal cards, like stamped envelopes, were sold for a price authorized by Congress. The statutory reference to the face value of postal cards, but not the face value of stamped

envelopes, may merely have been reflective of the fact that, at the time that Congress first enacted the criminal prohibition now in question, the face of postal cards set forth their legally established value while the face of stamped envelopes did not. It is not at all clear, therefore, that the criminal prohibition should be construed to preclude a proposed sales arrangement of the type at issue here. Under the Service's proposed sales arrangement, stamped cards would be permitted to be sold only for a price that, although greater than the price of postage that appears on their faces, would nevertheless conform to the fee that has been established by the administrative agency that Congress has authorized to set such fees.

In light of the ambiguity as to the inference that should be drawn from the differing statutory treatment of stamped envelopes and postal cards, we do not believe that § 1721 should be construed to bar the Service's proposed sales arrangement. Such a construction would serve to restrict the ability of the Service to adopt a method for the implementation of a fee change that appears to serve the broad purposes of the PRA. Congressional intent is better served by construing the ambiguity on this point in a manner that preserves the substantial discretion that the PRA appears to have been intended to confer upon the Service. For that reason, we conclude that § 1721 does not bar the Service from determining that the postal mark on a pre-stamped card indicates the value of the postage alone, not the value of the postal card, and thus from selling stamped cards bearing twenty-cents stamps for twenty-one cents.

## D.

A review of the legislative history to § 1721 accords with our conclusion that the face-sale provision should be construed to afford the Service the discretion to permit the sale of a postal card for an amount that reflects its authorized value even though it exceeds the amount of postage that appears on its face. It is evident from the legislative history that § 1721 was primarily intended to deter, prohibit, and punish fraudulent and *unauthorized* practices by postal employees in the pricing and sale of stamps, postcards, and other postal items. That general purpose accords with a construction of the terms of § 1721 that would permit the Service to offer a postal card for sale only at a price that had been fixed by regulation, even though it may be greater than the amount of postage that appears on its face.

That is not to dispute that a broad requirement that, in the absence of a countervailing indication on the face of a postal item, a postal item may not be sold for a price greater than the postage stamp would also protect against fraudulent sales practices. Such a requirement would arguably make it more difficult for postal employees to sell postal items for unauthorized prices because consumers would need only to consult the face of the postal item to determine the authorized

price. In that sense, the general anti-fraud purpose of the criminal prohibition arguably would be furthered by the intervenors' proposed construction of § 1721.

Nevertheless, the pertinent legislative history of § 1721 demonstrates that the predominant purpose of that provision, together with several others enacted or considered with it, was to prevent postmasters and other postal employees from engaging in fraudulent or other unauthorized practices in the sale of stamps, post-cards, and related postal items.[10] The legislative history at no point states that the statute was intended to protect against fraudulent practices through the imposition of a broad prophylactic rule that would preclude the sale of postal cards for an amount greater than the stamped postage in circumstances when no other monetary amount would appear on their faces.

The House debate on these measures tersely expressed the main purpose of the reforms under consideration: "The question and the only question for the committee to determine is which is the better proposition for the protection of the Government to prevent dishonest men from swindling the Government." 7 Cong. Rec. 2680 (1878) (remarks of Rep. Hewitt). During the debate on related provisions in the bill aimed at postmaster abuses, Representative Hewitt described the practices underlying the face value sale provision that was included in the bill under consideration and enacted in language essentially similar to that of § 1721:

> In the law as it now stands, as I said a moment ago, there is no prohibition of a postmaster selling stamps to whom he pleases and where he pleases. There is no provision in the law that prohibits him from trading them for goods or paying his debts with them — I mean in the present law as it now stands. And it was under that law this abuse had grown up, and just because the law did not prohibit it . . . .
>
> But now the Committee on Appropriations have reported a bill here which . . . absolutely prohibits the sale of stamps for less than their face value . . . . This bill not only prohibits that, but it prohibits postmasters from trading in stamps for goods, from using them in buying goods, or paying their debts with them; and it affixes a severe penalty for the violation of the law.

7 Cong. Rec. at 2679.

Later, defending the bill reported by the Appropriations Committee (which included the predecessor version of § 1721) against an amendment designed to increase the percentages of postal revenues payable to postmasters as compensation, Rep. Blount stated: "The proposition of the Committee on Appropriations

---

[10] The predecessor version of § 1721 and the related postal reform measures were considered as part of the Post Office Appropriation Bill for the Fiscal Year Ending June 30, 1879, H.R 4246, 45th Cong. (1878). *See* 7 Cong Rec. 2476 and *passim* (1878).

is not to change the law as to the percentage that the postmasters are paid, but it is simply to adopt another method to ascertain what they are paid. *It is simply an effort to avoid fraud; that and nothing more."* *Id.* at 2681 (emphasis added). Describing the Post Office Department's position on the pending sale and compensation provisions, Rep. Blount further stated: "The proposition now from the Department is not to decrease by this legislation the amount of [the postmasters'] salary, but to protect the Government against fraud." *Id.* As Rep. Blount proceeded to describe his own general approach to the bill: "[A]s a Representative upon this floor, bound to protect the Government, I shall not hesitate to provide proper legislation against fraud, even if some over-sensitive postmasters should imagine there is some reflection upon their integrity." *Id.*

Authoritative statements accompanying the passage of subsequent amendments and revisions of § 1721 further confirm the intent indicated in the original debate. Thus, when Congress modified and recodified the statute in 1909, ch. 321, *see* Act of March 4, 1909, § 208, 35 Stat. 1088, 1128, the accompanying legislative history characterized it as follows: "This section, like section 207, is designed to punish certain acts the effect of which is to defraud the postal revenue or to misappropriate the postal funds, and by means of the acts forbidden to fraudulently increase the compensation of postmasters and employees." S. Rep. No. 60–10, pt. 1, at 22 (1908). Similarly, the legislative history of the 1956 amendments to the statute, *see* Act of Aug. 1, 1956, ch. 818, 70 Stat. 784, again explained that the purpose of the provision was to prohibit postal employees from "so disposing of stamps, stamped envelopes, or postal cards as to inflate receipts artificially." S. Rep. No. 84–2720, at 1 (1956), *reprinted in* 1956 U.S.C.C.A.N. 3814, 3814. In describing the effect of the 1956 amendments, the accompanying House Report explained that they were designed to

> broaden the class of postal employees who are prohibited by existing law from inducing or attempting to induce any person to purchase postage stamps, stamped envelopes, or postal cards for the purpose of increasing the emoluments or compensation of the postmaster or any employee of any post office or any station or branch thereof.

H.R. Rep. No. 84–555, at 1 (1955).

The review of the legislative history that is set forth above reveals that there are no statements that directly speak to the issue that is before us in this matter. Only by drawing a questionable inference from the general anti-fraud statements that appear in the legislative history, therefore, could one conclude that Congress intended for § 1721 to establish a broad prophylactic rule against a sales arrangement of the type that the Service has proposed here. The broad nature of the administrative discretion that the PRA appears to confer upon the Service to make

and implement fee changes, however, counsels against the drawing of such an inference. The general anti-fraud statements that appear in the legislative history simply do not suffice to justify the conclusion that § 1721 should be construed to preclude the Service from exercising its broad administrative discretion in the manner that it proposes here. Accordingly, we conclude that the legislative history accords with our construction of the plain terms of § 1721.

## E.

We note one final point. Intervenors contend that their construction of § 1721 is supported by an early opinion of the Attorney General. That opinion asserted that the prohibition against postal sales at less than face value contained in a late nineteenth century version of § 1721, *see* Revised Statutes, § 3920, at 762; 20 Stat. at 141, extended to the Post Office Department and the Postmaster-General as well as to postmasters and other postal employees. *See* 25 Op. Att'y Gen. at 360. In that opinion, the Attorney General concluded that the Postmaster General lacked authority to approve a "Return-Postage" scheme proposed by a private contractor which would have relieved advertisers from paying postage on pre-addressed return cards and envelopes until they were actually deposited in the mails and reached the designated return address preprinted on the card.

Among other things, the Attorney General determined that such an arrangement would "violate the spirit and also the letter" of numerous provisions of the postal laws, including the version of § 1721 then in effect. In referring to that provision, the Attorney General stated that "[t]he Postmaster-General is clearly within the inhibition. Indeed, to rule otherwise would be to do violence to the plain and expressed intent of Congress." *Id*. After further noting that the proposal would allow the contractor to make its initial purchase of the return postal cards and stamped envelopes at a price far below that paid by the general public (reflecting the fact that the postage component would not be paid until the stamped card or envelope was actually returned and delivered), the Attorney General stated:

> I am unable to reconcile such a transaction with the plain and explicit injunction of Congress that 'no stamped envelopes shall be sold by the Post Office Department at less (in addition to legal postage) than the cost, including all salaries, clerk hire, and other expenses connected therewith,' 'or sell or dispose of postal cards for any larger or less sum than the values indicated on their faces.'

*Id*.

We do not find the reasoning of this opinion pertinent when applied to the matter presented here. Most significantly, the Postmaster-General in 1905 did not possess the broad statutory authority to change postage rates and fees that is vested

in the Service today pursuant to the PRA. *See* 39 U.S.C. § 403 (1994); *id.* § 404, *as amended by* PESEA, § 3, 112 Stat. at 1572; *id.* § § 3621–3625, *as amended by* PESEA, § 5, 112 Stat. at 1573. That is why the Attorney General's 1905 opinion stressed that the return postage scheme under consideration there could "not be put into operation without the express authority of Congress," 25 Op. Att'y Gen. at 357, or "without additional legislation." *Id.* at 366. In contrast, changes in postage rates and fees may be adopted today by the Service (with the Commission's concurrence) through administrative action alone pursuant to the procedures of the PRA. Passage of legislation by Congress is no longer required. The legal and regulatory framework on which the Attorney General's 1905 opinion was premised has been fundamentally altered by the intervening enactment of the PRA. Specifically, the Service is now authorized to impose a fee applicable to stamped cards, to prescribe the manner in which it is to be paid, and to promulgate a regulation providing for the collection of that fee. Thus, while the criminal prohibition may have been relevant to the Attorney General's late nineteenth century determination of whether the Postmaster General possessed statutory authority to enter into a contract to sell postal cards at a rate lower than that which had been authorized by Congress, it has no relevance to the present determination of how the Service may implement a change in postal fees that Congress has authorized.

BETH NOLAN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
